UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| B.R.S. REAL ESTATE, INC., <br> Plaintiff, <br><br> v. <br><br> CERTAIN UNDERWRITERS AT <br> LLOYD'S, LONDON SUBSCRIBING <br> TO POLICY NUMBER OMF1760087; <br> QUAKER SPECIAL RISK; AND <br> LAMARCHE ASSOCIATES, INC., <br> Defendants. | C.A. No. 1:20-cv-228-JJM-PAS |

## AMENDED MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Before the Court are Defendants'—Certain Underwriters at Lloyd's, London Subscribing to Policy Number OMF1760087 ("Lloyd's"), LaMarche Associates, Inc. ("LaMarche"), and Quaker Special Risk ("Quaker")—Motion to Confirm Appraisal Award, or in the Alternative, for Summary Judgment (ECF No. 26) and Motion for Summary Judgment (ECF No. 29).

I.  **BACKGROUND**

Plaintiff B.R.S. Real Estate, Inc. ("BRS") owned a parcel of commercial real property in Rhode Island that Defendants insured. ECF No. 1-1 at ¶ 12. The property was damaged by flooding that occurred because of an apparent freezing and bursting of pipes. *Id.* at ¶¶ 14-15. After BRS filed an insurance claim, Defendants agreed to pay for a firm to perform some—but not all—the mitigation and restoration work that

the firm recommended. *Id.* at ¶¶ 17-22. Defendants then sent an engineer to assess the property, and the engineer recommended replacement of various damaged systems. *Id.* at ¶¶ 25-26. When Defendants declined to pay for the full scope of work that was recommended, BRS requested an appraisal under the insurance contract. *Id.* at ¶¶ 27-30. Under this process, each party selects an impartial appraiser, the two appraisers then select an "umpire," and the three persons work to issue an "appraisal award"—on which only two of three must agree—that fairly sets forth the value of the property and the loss to the property. *Id.* at ¶¶ 29-30. Defendants selected as their appraiser the engineer who had assessed the property earlier. *Id.* at ¶ 34. BRS then sued in Rhode Island state court, which Defendants removed to this Court. ECF No. 1. BRS claims that this engineer[1] was not an impartial appraiser because the person previously had performed work related to this insurance claim for Defendants and in the past had done extensive work for insurance companies. ECF No. 1-1 at ¶¶ 36-37. BRS also claims that the umpire was incompetent and biased because he was a lawyer who worked for insurance companies. ECF No. 34-1 at 22.

## II.   STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure controls in deciding whether a party is entitled to summary judgment. Fed. R. Civ. P. 56. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

---

[1] Because of his dual role as an engineer and member of the appraisal panel, the Court will refer to him as the "engineer-appraiser" moving forward.

material fact and the movant is entitled to judgment as a matter of law." *Id.* More particularly,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When deciding whether the Court should grant summary judgment, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Rsch. Corp.*, 63 F.3d 32, 36 (1st Cir. 1995) (citation omitted). As alluded to, there must first be no genuine issues of material fact. "[M]ere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, the issue must be genuine and material. *See id.* "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party . . . . '[M]aterial' means that the fact is one that might affect the outcome of the suit under the governing law." *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir. 1994) (internal quotation marks omitted) (citations omitted).

Additionally, the moving party must be entitled to judgment as a matter of law. The moving party is "entitled to a judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with

respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323 (internal quotation marks omitted) (citations omitted). The Court decides this latter element of the summary judgment standard by evaluating "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252 (alteration in original) (emphasis in original) (internal quotation marks omitted) (citation omitted).

## III. DISCUSSION

BRS alleges four claims. ECF No. 1-1 at 8-10. First, to the extent that the Court finds further process necessary to grant the other relief sought, BRS seeks an order compelling Defendants to participate in an impartial appraisal process. *Id.* at ¶ 49. Second, BRS claims that Defendants breached the insurance contract by failing to retain a "competent and impartial" appraiser as required by the language of the insurance agreement. *Id.* at ¶ 53. Third, BRS seeks a declaratory judgment that vacates the current appraisal award and states that BRS is covered under the insurance policy for all the work performed. *Id.* at ¶ 58. Finally, BRS claims that Defendants' use of a biased appraiser and reliance on an invalid appraisal award constitute bad faith and unfair claims settlement practices under R.I. Gen. Laws § 27-9.1-1, *et seq. Id.* at ¶ 63.

Lloyd's responds that there is no evidence of an incompetent appraisal panel member or bias during the appraisal process. ECF No. 27 at 1. Additionally, Lloyd's argues that a claim for bad faith or unfair claims settlement practices cannot exist here absent bias or incompetence. *Id.* at 1. Lloyd's further renews its motion to

confirm the appraisal award. ECF No. 26 at 1. LaMarche and Quaker separately argue that they maintained no contract with BRS, and thus cannot be sued for breach. ECF No. 30 at 1. LaMarche and Quaker also argue that they do not constitute "insurers" under R.I. Gen. Laws § 9-1-33, and thus owed BRS no other legal duties. *Id.*

### A. Whether Appraisers were Impartial and Competent

BRS' appraisal challenge and breach of contract[2] claim largely turn on the issue of whether Defendants' appraiser and the umpire were impartial and competent.[3] Rhode Island courts have held that a party seeking to challenge an appraisal award must establish "a reasonable impression of partiality." *Aetna Cas. & Sur. Co. v. Grabbert*, 590 A.2d 88, 96 (1991) (citation omitted). This showing requires "more than an appearance of bias but less than actual bias." *Id.* (citations

---

[2] Because the Court does not find that the contract was breached, it need not decide the question of whether LaMarche and Quaker also are liable. BRS is entitled to no other relief regarding the appraisal process without a finding of either partiality or incompetence.

[3] The Rhode Island Supreme Court has "consistently maintained that an award may be vacated only if it is 'irrational' or 'manifestly disregards the applicable contract provisions,' . . . or if it falls within one of the four statutorily prescribed grounds in § 10–3–12." *Aetna Cas. & Sur. Co. v. Grabbert*, 590 A.2d 88, 92 (1991) (quoting *State v. Nat'l Ass'n. of Governmental Emps. Loc. No. 79*, 544 A.2d 117 (R.I. 1988)). But the contract provision here contains no further explanation of impartiality or competence. *See* ECF No. 28-2. The Court thus must look to ordinary definitions of these words, which it does not take to significantly differ from the standards for impartiality and competence that the state statute requires. In fact, BRS cites no cases in which a Rhode Island court construed ambiguous language in a policy to require a higher standard of impartiality than the state statute. *See* ECF No. 34-1. Nor does BRS cite any authority for its proposition that the word "competent" requires that the umpire "know[] how to prepare his own estimate of the [c]laim damages if necessary." *Id.* at 19. For reasons explained later, this rigid definition of competence also does not necessarily make sense. *See infra* Part III.A.2.

omitted). Meaning, "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.* (citation omitted). Plaintiff also must establish a causal nexus "between the party-appointed arbitrator's improper conduct and the award ultimately decided upon." *Id.* While these cases use the "arbitrator" language, the appraisal process constitutes arbitration under Rhode Island law. *Waradzin v. Aetna Cas. and Sur. Co.*, 570 A.2d 649, 650 (R.I. 1990). With this standard in mind, the Court first discusses the engineer-appraiser and then turns to the umpire.

### 1.   Impartiality of the Engineer-Appraiser

Lloyd's asserts that the only facts that suggest impartiality are that the engineer-appraiser previously worked for Defendants on BRS' claim and that the engineer's firm generally works for insurance companies. ECF No. 27 at 3-4. In fact, all three participants in the appraisal signed a declaration swearing that they would remain impartial and make a "true, just[,] and conscientious award . . . according to the best of [their] knowledge, skill[,] and judgment." ECF No. 28-7 at 13. And Lloyd's stresses that BRS never raised the impartiality issue during the arbitration process. ECF No. 27 at 16-19. Accordingly, Lloyd's submits that there is no basis to vacate the appraisal award.[4] *Id.* at 14-16.

---

[4] Lloyd's alternatively argues that BRS waived its right to bring this suit because it failed to raise the impartiality issue during the appraisal process. *Id.* at 16-19. But BRS raised concerns—even if not the impartiality issue explicitly—about the process during the arbitration. *See, e.g.*, ECF Nos. 28-5 at 26-27 (reflecting that BRS appeared to not want its appraiser to sign the appraisal award over concerns with it), 28-7 at 22 (reflecting that BRS pointed out a mistake in the initial appraisal award).

BRS contends that a person reasonably would not believe that the engineer-appraiser was impartial due to his work for Defendants on this insurance claim (and other insurance claims). ECF No. 34-1 at 15-25. BRS also suggests that the appraisal process was biased because the engineer-appraiser's submission to the umpire ultimately matched the previous estimates that he had quoted to Defendants.[5] *Id.* at 8. An error in the initial appraisal award required the issuance of an amended award. *Id.* at 8. In fact, this error required the engineer-appraiser to recalculate his valuation, which was ultimately adopted in the amended award. *Id.* Accordingly, both appraisal awards exactly matched both estimates that the engineer-appraiser had quoted. *Id.*

While the engineer-appraiser's previous work for insurance companies raised an appearance of impartiality, this fact alone suggests nothing further. For example, an expert economist might provide economic analysis on behalf of only patent holders. But this trend might result from the fact that her valuation methodology tends to yield higher damages numbers than other methodologies, and thus putative patent infringers would hesitate to retain her. It would be peculiar to suggest that such an expert is biased (in the non-statistical sense of the word) toward the patent holder she is representing because the methodology that she believes is most accurate tends

---

[5] BRS also argues that the appraisal award was irrational. ECF No. 34-1 at 27-29. But the evidence that BRS presents does not question the valuation methodology. Defendants have presented extensive documentation regarding the claims process, which includes quotes on the cost of the work and the extent of the damage. *See* ECF No. 28. While the parties might dispute these numbers—and the lower number ultimately might have been selected through bias—these facts do not rise to the level of irrationality.

7

to generally favor patent holders in litigation. To be sure, the expert might select this methodology just because she has a policy preference for strong remedies for patent holders (or even this patent holder). In that case, the expert's bias—and not her sincerely held belief on which methodology is most accurate—drives the outcome. Yet this latter hypothetical turns on additional facts beyond an expert's working for one type of client. Alternatively, patent holders may have hired this expert on a recommendation or for some other reason, and once she started to work consistently for patent holders, putative patent infringers became hesitant to hire her. All sorts of reasons exist for a consultant to work for only, or primarily, one type of client. Because not all these reasons represent bias, facts beyond those here are required to make such a determination. The engineer-appraiser's work for insurance companies thus demonstrates no more than an appearance of bias.

BRS adds that, before he was even selected to participate in the appraisal process, the engineer-appraiser had concluded that BRS' estimate was excessive. ECF No. 34-1 at 20 (quoting ECF No. 10-1 at 6) (the engineer-appraiser had "reviewed the file and had agreed that [BRS'] estimate was excessive"). However, in a non-neutral arbitration, it is the party-appointed members' role to provide expertise to the umpire and present the facts in a manner that ensures their respective sides will be "represented on the arbitration panel by a sympathetic member." *Grabbert*, 590 A.2d at 93 (citation omitted). For the reasons stated above, facts beyond those here are required to determine that this statement represented more than an appearance of bias. If he previously opined on the value of a property, naturally he would adhere

8

to that opinion in later proceedings. Even so, the engineer-appraiser changed his mind and voted to amend the appraisal award to a higher amount because he recognized a mistake in the earlier award. ECF No. 28-7 at 22. The engineer-appraiser reviewed the building and based his estimates on an assessment of each aspect of the building's condition. *See* ECF No. 28-7. Despite all this prior work, his recognition and acceptance of this mistake demonstrate an open mind during the process. BRS proffers no evidence that this mistake actually was an intentional attempt to devalue the property and that it was only corrected on the engineer-appraiser's being caught.

The Court, of course, does not recount these facts to make credibility judgments or weigh in on their veracity. The Court uses these facts to demonstrate only that BRS does not challenge the process itself beyond generalized assertions that it was a collaborative effort to favor Defendants. *See* ECF No. 34-1 at 21-23. Yet these assertions turn on the engineer-appraiser's prior relationship with Defendants. That is, they independently do not present evidence of bias beyond the prior analyses. Moreover, where the Rhode Island Supreme Court had found that an arbitration panel member's prior relationship with a party caused a conflict, that relationship carried greater significance. *See, e.g., McGinity v. Pawtucket Mut. Ins. Co.*, 899 A.2d 504, 508 (2006) ("An arbitrator who also serves as an attorney to one of the parties arrives at the arbitration table imbued with a uniquely privileged role that may often have an especially potent influence on the neutral arbitrator."). Unlike an attorney, neither an engineer nor an appraiser has the same duty of zealous advocacy on behalf

9

of a client. The engineer-appraiser's prior work alone is thus insufficient to show more than an appearance of bias. Accordingly, the Court must look to other facts.

BRS bolsters its suggestion of bias with a couple additional facts. During the appraisal process only the umpire and engineer-appraiser ever agreed on an appraisal award. ECF No. 34-1 at 8; *see also McGinity*, 899 A.2d at 508 (citing *Grabbert*, 590 A.2d at 96) ("Crucially, in *Grabbert*, the arbitration award was supported by all three of the members of the arbitration panel."). And both the original and amended awards that these two individuals adopted reflected the engineer-appraiser's exact valuations. ECF No. 34-1 at 8. But this issue is complicated by the fact that the umpire—who was an attorney—did not prepare his own estimate. *See* ECF No. 28-3 at 2-4. As an attorney, the umpire was ill suited to sorting through the technicalities of construction estimates. Yet much like a factfinder does in litigation,[6] the umpire was suited to selecting between competing estimates that were prepared by experts in the field. Also as discussed, the engineer-appraiser's recognition and acceptance of his mistake cut against finding bias. There is nothing necessarily nefarious about this sequence of events. And while everyone's signing the award confirms its soundness, one participant's not signing the appraisal award requires further investigation. Here, the record reflects uncertainty over the influence on BRS' appraiser's decision not to sign the award. *See* ECF Nos. 28-5 at 26-27, 28-7 at 17-18. But even if BRS' appraiser independently did not sign the award

---

[6] A system with which the umpire was likely quite familiar from his legal experience.

because he disagreed with it, there is no evidence that he did not sign because he independently believed that the process was tainted by bias or incompetence. Accordingly, these added facts do not suggest more than an appearance of bias.

Lastly, BRS must show that there was a causal nexus between the bias and the appraisal award. *Grabbert*, 590 A.2d 88 at 96. To say that the engineer-appraiser was biased and that the appraisal award favored Defendants remains insufficient. Assuming that the engineer-appraiser was biased, BRS must demonstrate that this bias caused the lower appraisal award on which a majority of the panel ultimately voted. BRS, nonetheless, more easily can meet this standard. The earlier reasons that vindicated the umpire's conduct demonstrate causation. If the umpire is deciding which appraisal to credit—as he appears to have done here—and he agrees to an appraisal award that was based on a biased valuation, then the bias directly led to a lower appraisal award. To be sure, the umpire independently might have determined the appraisal award to be the proper amount. But Defendants present no evidence to corroborate such a finding. And even if the umpire independently would have selected a slightly lower appraisal award but thought this one reasonable and thus voted for it, a causal nexus still would exist (even if the harm were minimal).

### 2. Impartiality and Competence of the Umpire

BRS also argues that the umpire was incompetent and biased, and thus could not have properly voted on the appraisal award. ECF No. 34-1 at 22. The Court first considers competence, and then turns to bias. BRS—citing no legal authority—relies on the proposition that a reasonable person could only deem a participant in the

appraisal process competent if that participant specifically possessed construction, adjusting, or appraising experience. *See* ECF No. 34-1 at 21-23. But as discussed, the Court has serious concerns about this proposition. The umpire, as an attorney, was ill suited to sorting through the technicalities of construction estimates. But based on his legal experience, the umpire was suited to selecting between competing estimates that were prepared by experts in the field. And no party disputes that the umpire appears to have previous experience with insurance law. ECF Nos. 28-5 at 32 (noting that the umpire's website represents that he has worked for more than fifty insurance companies), 28-7 at 11 (reflecting that the engineer-appraiser believed the umpire to be experienced in "both construction and insurance law"). He thus must have maintained some knowledge of the relevant non-legal fields. He also brought his own experience with topics like insurance contracts to supplement the construction and appraisal experience of the other two participants in the appraisal. In that respect, his experience was an asset, rather than an impairment. Despite these considerations, BRS fails to suggest why they are not applicable here or why the experience that it requires of the umpire is so critical.

Further, for the reasons explained above, any prior work for insurance companies by the umpire remains insufficient evidence of bias. BRS points to no additional facts—as it did with the engineer-appraiser—that would indicate bias on the umpire's part. For example, the umpire did not perform any previous work on the claim for Defendants. *See* ECF No. 28-3 at ¶ 11. BRS makes only bare assertions that the umpire relied only on Defendants' estimates and appeared to be collaborating

12

with Defendants throughout the process. *See* ECF No. 34-1 at 21-23. But no evidence in the record supports this contention, and it appears that all three participants in the appraisal extensively communicated with each other. *See generally* ECF No. 28-5. The whole procedure may not have been that formal, but there is nothing inherently problematic about these circumstances given that appraisal panels are not held to the standards of courts. *Grabbert*, 590 A.2d at 92 (internal quotation marks omitted) (citation omitted) ("The [Rhode Island Supreme] Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges.").

Lastly, the engineer-appraiser appears to have talked BRS' appraiser out of his initial choice because of practical concerns. *See* ECF No. 28-7 at 10-11 (reflecting that the engineer-appraiser was concerned about BRS' appraiser's initial choice for umpire because hiring that person would cost more). BRS' appraiser ultimately selected the umpire from a list of three lawyers that the engineer-appraiser had provided. *Id.* Still, the facts do not suggest that BRS' appraiser was forced to make this selection. To be sure, the engineer-appraiser likely advocated for his side when compiling these names and objecting to BRS' appraiser's initial choice. But never did BRS' appraiser appear to raise an explicit objection. *See id.* Nor did he exercise his right to disagree with a choice, as both appraisers had to agree on an umpire. If BRS so strongly objected to the umpire who ultimately was selected, it should have—and presumably would have—made a bigger deal out of the selection process at the time. Yet neither BRS' briefs nor the record reflects such a concern. If BRS claims that it

13

did not realize how biased and incompetent the umpire was until after the process, it needs to come with specific facts. Yet BRS adduces no such facts that indicate bias or incompetence that revealed itself only after the process.

\* \* \*

The facts largely are not in dispute. The real dispute appears to be whether the facts entitle Defendants to summary judgment. The claims of bias based on prior work, or prior opinions, do not meet the legal standard of more than an appearance of bias. While the circumstances of the appraisal process might be consistent with a finding of bias, they do not in themselves demonstrate more than an appearance of bias. BRS also asks for an overly rigid definition of competence without adequate authority. As the Rhode Island Supreme Court has stated, "[t]he parties to an arbitration have agreed to settle their dispute without a judge; judicial economy dictates that our interference be limited to [appropriate] instances." *McGinity*, 899 A.2d at 509. BRS has not adduced enough facts to justify such interference.

### B. Whether Defendants Engaged in Bad Faith or Unfair Claims Settlement Practices

BRS further alleges that "Defendants' use of a biased appraisal process and reliance upon an invalid Appraisal Award, and its other actions and omissions concerning the [c]laim, constitute unfair claims settlement practices and bad faith." ECF No. 1-1 at ¶¶ 61, 63. Defendants respond that such a claim could be predicated only on a finding of partiality or incompetence, and thus fails because neither was present. ECF No. 27 at 1.

In one of its briefs, BRS—while asserting that this claim should be stayed—argues that nonetheless summary judgment is not warranted. ECF No. 34-1 at 2-3. But in the same brief, BRS does not make arguments beyond those discussed above. *See id.* In its other brief, BRS argues that it should be able to maintain a common law bad-faith claim, even if its statutory claims cannot stand. ECF No. 36-1 at 5-6. Once again, however, BRS does not advance arguments beyond those discussed above. *See id.* Therefore, staying this claim to resolve it later would be futile. "Under Rhode Island law, . . . a plaintiff first must show that he or she is entitled to recover on the contract before he or she can prove that the insurer dealt with him or her in bad faith." *Zarrella v. Minn. Mut. Life Ins. Co.*, 824 A.2d 1249, 1261 (R.I. 2003). After all, how can a process that is considered impartial and competently conducted under the arbitration statute and the insurance policy also be deemed "unfair" or conducted in "bad faith?" In its Complaint and briefs, BRS does not highlight other aspects of the process—beyond impartiality and competence—that might otherwise constitute actionable conduct. There are thus no genuine issues of material fact on which BRS could predicate a claim for bad faith or unfair claims settlement practice.

## IV. CONCLUSION

Rhode Island law states that, "within one year after the award is made, any party to the arbitration may apply to the court for an order confirming the award, and thereupon the court must grant the order confirming the award unless the award is vacated, modified[,] or corrected, as prescribed in §§ 10-3-12—10-3-14." R.I. Gen. Laws § 10-3-11. Because the Court finds that no participant in the appraisal process

was biased or incompetent and that the process adhered to the language of the insurance policy, there are no legal grounds on which to vacate the appraisal award. The Court also finds no other conduct that could constitute bad faith or an unfair claims settlement practice. The Court, therefore, GRANTS Defendants' Motions for Summary Judgment. ECF Nos. 26, 29. The Court further GRANTS Defendants' Motion to Confirm Appraisal Award. ECF No. 10.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief Judge
United States District Court

July 18, 2023